**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHRISTINA L.,**

        **Plaintiff,**

v.                                           **Civil Action 2:22-cv-2294
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**OPINION AND ORDER**

Plaintiff, Christina L., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **GRANTS** Plaintiff's Statement of Errors (Doc. 11), **REVERSES** the Commissioner of Social Security's non-disability finding, and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.**     **BACKGROUND**

Plaintiff protectively filed her applications for DIB and SSI on August 21, 2019, alleging disability beginning December 31, 2013, due to a spine disorder. (R. at 210–25, 280). After her applications were denied initially and on reconsideration, Administrative Law Judge Joseph G. Hajjar (the "ALJ") held a telephone hearing on February 19, 2021. (R. at 33–61). The ALJ denied benefits in a written decision on March 22, 2021. (R. at 12–32). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision (Doc. 1), the Commissioner filed the administrative record (Doc. 8), and the matter has been briefed and is ripe for consideration (Docs. 11, 12).

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing as follows:

> At the hearing, [Plaintiff] testified that she has significant pain, numbness and tingling in her back and legs. The claimant reported having multiple surgeries on her back that have not resolved her symptoms. She stated that her back pain has increased over the years. It is now a daily chore to take care of herself. She is unable to shower, get dressed and leave the house. She testified that she tries to reserve all her energy for "important things," such as taking care of her grandchildren. She sees a pain management specialist and is prescribed pain medication, but testified that it makes her foggy headed. The claimant rated her pain as 7 - 8 out of 10 without medication, with 10 being the most severe, but her medication only reduces her pain to a 5 - 6 out of 10. She is unable to stand still, needing to constantly shift her weight in order to avoid increased numbness and tingling in her legs. The claimant also testified that she needs to use a cane to walk.

(R. at 21).

### B. Relevant Medical Evidence

The ALJ summarized the medical records as follows:

> In regards to [Plaintiff]'s degenerative disc disease, the record shows that [Plaintiff] has undergone five surgeries on her cervical and lumbar spine (B15F). The evidence of record is sparse in providing a narrative as to [Plaintiff]'s functioning. Rather, from 2013 through 2020, the record mostly contains medical imagining [sic] and operative reports (B1F; B2F; B3F; B4F; B5F; B6F; B12F). Imagining [sic] from March 2013 showed advanced discogenic degenerative changes of the lower cervical spine, resulting in spinal stenosis and neural foraminal narrowing (B1F/36). An MRI of the cervical spine from April 2013 showed discogenic degenerative changes at C5-6 and C6-7, spinal stenosis and neural frontal narrowing (B1F/34-35). The record suggests that [Plaintiff] had a cervical discectomy with fusion sometime in May 2013 (B12F/8).
>
> An MRI of the lumbar spine from November 2013 showed degenerative endplate changes at L1 and L2, a large disc extrusion at L1-2, a diffuse disc bulge with mild facet arthropathy at L2-3, L3-4, L4-5 and L5-6 (B1F/30-31). The disc extrusion at L1-2 caused moderate to severe canal stenosis and left neural foraminal stenosis (B1F/31). A CT scan showed significant left foraminal stenosis at L1-2 due to a

spur formation and facet arthropathy at all lumbar levels (B6F/105). Imagining of the cervical spine showed stable post-operative changes (B6F/109). X-rays of [Plaintiff]'s lumbar spine from February 2014 showed degenerative changes of the lumbar spine (B1F/29). An MRI showed [Plaintiff]'s lumbar fusion from L1-3 and facet arthropathy from L3-S1, worst at L5-S1 with slight degenerative spondylolisthesis of L5 on S1 (B6F/95). X-rays from the lumbar spine from April 2014 were consistent with the February imagining [sic] (B1F/28).

Seven months later, imagining [sic] of the lumbar spine further showed grade 1 anterolisthesis of L5 on S1 (B6F/91). Images of the cervical spine showed anterior cervical fusion from C5-7 and degenerative disc disease at C4-5 and anterolisthesis of C3 relative to C4 and C4 relative to C5 (B6F/93). A CT scan of the lumbar spine from April 2015 showed facet arthropathy at L5-S1 and degenerative disc disease with canal stenosis (B1F/21). An MRI showed defects in her previous laminectomy at L1 and L2, degenerative bulging at L3-4 with narrowing and mild facet arthritis, and advanced facet arthritis at L5-S1 (B1F/23).

Treatment notes from October 2015 from a pulmonologist show normal range of motion of the upper and lower extremities, normal sensation and normal strength (B1F/74). However, later this month, [Plaintiff] reported chronic pain in her lumbar and thoracic spine (B2F/3). She complained of aching, burning, cramping, shooting and stabbing pain, rating it as 8 out of 10, with 10 being the most severe (B2F/3). Examination notes lumbar tenderness and limited range of motion, as well as antalgic gait (B2F/5). There is also notation that [Plaintiff] used a cane for stability (B2F/5). However, there is no evidence that this cane was prescribed for ambulation. She was diagnosed with post-laminectomy syndrome and recommended insertion of a spinal cord stimulator (B2F/6).

On November 20, 2015, [Plaintiff] underwent surgery to place a spinal cord stimulator at the T6-7 juncture (B2F/8, 9-10). Evidence after this procedure shows that [Plaintiff] had significant pain relief with the stimulator (B3F/5). Just four days after the surgery, [Plaintiff] reported that her pain had lessened to 3 or 4 out of 10 (B4F/15). Treatment notes show improved range of motion and gait (B4F/17). The claimant did not seek any treatment for her back for almost a year and a half. But, an x-ray taken in December 2016 showed no abnormalities aside from normal post-operative changes (B6F/76).

In April 2017, [Plaintiff] returned to treatment (B2F/41). Treatment notes show that [Plaintiff] had good pain relief with the spinal cord stimulator until recently (B2F/41). She complained of radiating pain into her legs (B2F/41). On April 7, 2017, [Plaintiff] received an epidural steroid injection to her lumbar spine (B2F/38). Medical imaging from this period show disc extrusion toward the right at L3-4 extending behind the superior endplate of L4 on the right, causing stenosis of the thecal sac and narrowing of the right neural foramen, as well as mild stenosis of the thecal sac at L4-5 from a small disc protrusion (B6F/73). The injection was repeated in June (B2F/44). At some point after this injection, [Plaintiff] had another lumbar

3

spine surgery (B2F; B5F). X-rays from July 2017 showed moderate facet arthrosis in the lower lumbar spine and grade 1 anterolisthesis of L5 on S1, but there was only a fusion of L1-3 (B6F/69). Imagining [sic] from August 2017 showed that [Plaintiff]'s spinal fusion extended from T10-L4 (B6F/61, 63).

An MRI of the cervical spine taken in October 2017 showed a leak in [Plaintiff]'s spinal stimulator (B6F/52). There was spinal fluid leaking and causing positional headaches (B6F/53). The claimant had another procedure to remove the defective stimulator, but it is unclear when.

Imagining from January 2020 show post-surgical findings of the thoracolumbar fusion without abnormalities (B6F/49).

In October 2018, [Plaintiff] reported having significant back pain, rating it as 8 – 10 out of 10 (B3F/5). An MRI of the thoracic and lumbar spine bone marrow edema in the L4-5 vertebral endplates due to Modic type I fibrovascular degenerative endplate changes, broad-based disc extrusion and severe facet arthrosis resulting in moderate central spinal canal stenosis and severe narrowing of the right lateral recess at L4-5, and severe facet arthrosis and grade 1 degenerative anterolisthesis at L5-S1 (B3F/12). She was recommended another spinal stimulator, since the previous one was so effective at managing her pain (B3F/5). On November 14, 2018, [Plaintiff] underwent another spinal stimulator placement surgery (B2F/77, 80). Follow-up notes show that [Plaintiff] had 70% relief with her pain just two weeks later (B3F/21).

An MRI of [Plaintiff]'s cervical spine from December 2018 shows moderate central canal stenosis at C5-6 with mild central canal stenosis at C4-5 and C6-7, as well as moderate to severe foraminal narrowing at C6-7 (B5F/27). On January 31, 2019, [Plaintiff] underwent yet another spinal surgery (B5F/39). This time she had her previous C5-7 fusion plate removed and underwent a C4-5 anterior cervical microdiscectomy with osteophytectomy and decompression and fusion of the C4-5 vertebrate (B5F/39). After this surgery, [Plaintiff] began participating in physical therapy (B5F).

On March 11, 2019, [Plaintiff] underwent her another surgery during the adjudicating period (B5F/68). She had exploration of her L3-4 fusion and replacement of her hardware, with complete laminectomy (B5F/68). Also[,] from this month [Plaintiff] had x-rays taken of her cervical spine, which showed stable post-operative changes (B6F/24). In May 2019, [Plaintiff] reported that she still had some pain, but rated it as 4 out of 10 (B4F34). She has using Effexor and Oxycodone to manage her pain (B4F/34). A CT scan performed in June 2019 showed no spinal canal stenosis and hardware and spinal stimulator intact (B5F/97). X-rays of the lumbar spine showed fusion from T10 – L5 without changes or hardware-associated complications (B6F/20).

4

> Treatment notes from December 2019 show complaints of mid to low back pain that radiated down through her hips and legs (B8F/3). The claimant reported numbness in her feet, and weakness and aching her both legs, with the right worse than the left (B8F/3). She rated her pain as 6 out of 10, but her medication can reduce it to 4 or 5 out of 10 (B8F/3). She was using her spinal cord stimulator, which helps with her back pain (B8F/5). Treatment notes show that [Plaintiff] walked with a cane, favoring her right leg, and discomfort with extension after flexion (B8F/4). She was diagnosed with lumbar post-laminectomy syndrome, chronic pain disorder, failed back syndrome and spinal stenosis (B8F/4). Shortly thereafter, [Plaintiff] received a bilateral L5-S1 medial branch block (B8F/5). A few weeks later, she received a thermal radiofrequency ablation at L5-S1 (B8F/15). At a follow-up visit, [Plaintiff] presented with pain with palpation and decreased range of motion to the low back (B8F/12, 15).
>
> Two months later, [Plaintiff] reported that her pain was better controlled with the radiofrequency ablation then it had been for years (B10F/18). She was "very happy" with the progress of her pain relief (B10F/18). An examination showed antalgic gait favoring the right lower extremity and some tenderness to palpation (B10F/22; B11F/22). In July, [Plaintiff] had another radiofrequency ablation (B12F/2). However, the following month, [Plaintiff] reported ongoing low back and neck pain (B13F/25). The claimant reported poor balance, gait instability, occasional falls, right lateral hip pain, and numbness (B13F/26). She also indicated that she had left arm paresthesias and weakness (B13F/25). Examination notes show asymmetric reflexes and sensory changes in her left arm (B13F/25). The claimant also had a limp and tenderness to palpation of the right lateral hip (B13F/27). She was recommended additional medical imagining [sic] to ascertain the cause of her symptoms (B13F/25).
>
> In October 2020, [Plaintiff] had a telehealth visit with a neurosurgeon about her back (B13F/4). Medical imagining [sic] taken as part of this appointment show persistent osteophytes at C5-6 that was not significantly compressive of the cervical spine (B13F/3). The imagining [sic] also showed facet arthropathy at L5-S1, which appeared to be the cause of [Plaintiff]'s pain (B13F/3, 15-16). However, her surgeon stated that this stress on a single disk segment was not in urgent need of invasive treatment (B13F/3, 5). However, the surgeon also stated that [Plaintiff] may need additional fusion of her lower lumbar vertebrae to fully alleviate her pain (B13F/3-4). Two months later, [Plaintiff] opted to proceed with that additional fusion surgery (B14F/3). On December 14, 2020, [Plaintiff] underwent her final surgery and had a fusion of L5-S1 (B14F/33). ***
>
> *** Review of the record shows that [Plaintiff]'s BMI ranged from 30.36 to 37.79 (B2F; B4F; B5F; B8F; B11F; B14F). ***

(R. at 21–24).

### C. The ALJ's Decision

5

The ALJ found that Plaintiff meets the insured status requirements through September 30, 2016 and has not engaged in substantial gainful activity since December 31, 2013, her alleged onset date of disability. (R. at 18). The ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease and obesity. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meets or medically equal a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: frequently reach overhead to the left and right; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl; never work around hazards, such as unprotected heights, dangerous moving machinery and commercial driving.

(R. at 20).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record …" (R. at 21).

Relying on the vocational expert ("VE")'s testimony, the ALJ concluded that Plaintiff is unable to perform her past relevant work as a bus driver. (R. at 25–26). Further relying on the VE's testimony, the ALJ determined that Plaintiff would be able to perform the requirements of representative occupations in the national economy such as a mailroom clerk, marker, or housekeeper. (R. at 26–27). He therefore concluded that Plaintiff has not been disabled within the meaning of the Social Security Act, since December 31, 2013. (R. at 27).

## II.     STANDARD OF REVIEW

6

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**III.    DISCUSSION**

On appeal, Plaintiff contends that the RFC determination is not supported by substantial evidence, because the ALJ's RFC determination does not adequately account for Plaintiff's use of an assistive device. (Doc. 11). In the alternative, Plaintiff argues that the ALJ failed to sufficiently analyze whether an assistive device was medically necessary in the RFC determination. (*Id.* at 12).

The Commissioner counters that the ALJ's residual functional capacity was supported by substantial evidence and that he reasonably evaluated the state agency assessments and other evidence. (Doc. 12). Per the Commissioner, the ALJ also reasonably found that Plaintiff did not

7

need an assistive device considering the evidence showing improvement after her surgeries and the state agency opinions that she could perform light work. (*Id.*).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id*. The ALJ is not required to incorporate use of a cane into the RFC unless the cane is medically required, in which case the cane is considered a limitation on a claimant's ability to work. *See Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002); *see also Baker v. Comm'r of Soc. Sec.,* No. 2:19-cv-4323, 2020 WL 2213893, at *7 (S.D. Ohio May 7, 2020). Social Security Ruling 96-9p explains when a cane or other hand-held assistive device is "medically required" and the implications of that medical need for a claimant's RFC:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). The "burden to prove through clinical evidence that a cane is medically required" is on the claimant. *Baker,* 2020 WL 2213893, at *7 (quoting *Strain v. Comm'r of Soc. Sec. Admin.*, No. 5:12-cv-1368, 2013 WL 3947160, at *2 (N.D. Ohio Aug. 1, 2013)).

Here, the ALJ found that Plaintiff could perform a range of light work with the following limitations: "frequently reach overhead to the left and right; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasional stoop, kneel, crouch[,] and crawl; never work around hazards, such as unprotected heights, dangerous moving machinery[,]

8

and commercial driving." (R. at 20). Generally, light work is characterized by "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds[,]" and "a good deal of walking or standing, or ... sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10.

Plaintiff has undergone eighteen (18) procedures on her spine from May 2013 to December 2020. (R. at 985–86). During that time, Plaintiff's medical records consistently document her use of an assistive device, namely canes and wheeled walkers. (R. at 95–97, 389, 623, 641, 809, 953, 970, 977, 995). And it notes her gait problems. (R. at 95–97, 857–58, 889–90, 953–54, 976–77). Yet, the ALJ made no limitations to standing or walking in the RFC determination. (*See* R. at 20).

The ALJ only briefly mentions Plaintiff's use of an assistive device. He summarizes that the Plaintiff "testified that she needs to use a cane to walk," but goes on to say that "there is no evidence that this cane was prescribed for ambulation." (R. at 21–22). It is true that there is no prescription for an assistive device in the record, but physical therapists recently recommended that Plaintiff use a cane or walker. (R. at 976). And, in December 2020, occupational therapists noted Plaintiff's use of a cane for walking and did not recommend any durable medical equipment ("DME") because she "has needed equipment." (R. at 996–98). While "it is the ALJ's task and not the Court's, to resolve conflicts in the evidence" concerning the need for a cane, *Bowen v. Comm'r of Soc. Sec.*, No. 17-17, 2018 WL 328964, at *3 (S.D. Oh. Jan. 9, 2018), "the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019). Here,

9

the ALJ simply has not built this logical bridge. The ALJ's brief statement on the lack of prescription for a cane does not accurately and logically connect the ample evidence in the record of Plaintiff's use of an assistive device with his conclusion that it was not medically necessary. In fact, the ALJ never expressly concludes that the use of a cane is not medically required as per Social Security Ruling 96-9p. He simply says there was no prescription for a cane and then later concludes, without further explanation, that no limitations to walking or standing are necessary for Plaintiff in the RFC. This is insufficient.

At base, the ALJ did not explain the RFC in a way that Plaintiff or this Court can understand. Accordingly, Plaintiff's Statement of Errors (Doc. 11) is well taken.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 11) be **GRANTED** and the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

IT IS SO ORDERED.

Date: February 6, 2023 　　　　　　　　　　　/s/ Kimberly A. Jolson
　　　　　　　　　　　　　　　　　　　　　　　KIMBERLY A. JOLSON
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE